UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
ALI MAHMUD ALI SHAFI, et al.,   )
                                )
          Plaintiffs,           )
                                )
          v.                    )      Civil Action No. 09-06 (RWR)
                                )
PALESTINIAN AUTHORITY,          )
et al.,                         )
                                )
          Defendants.           )
_____)
```

MEMORANDUM OPINION

Plaintiffs Ali Mahmud Ali Shafi, his common-law wife, Shirin Ali Shafi, and his minor daughter, Lamia Ali Shafi, bring claims under the Alien Torts Statute ("ATS") and the Israeli Civil Wrongs Ordinance against the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO"), alleging that the defendants violated the law of nations and Israeli law by abducting and torturing Ali.[1]  The defendants move to dismiss, arguing, among other things, that the Torture Victims Protection Act ("TVPA") provides the sole cause of action for claims alleging torture under color of foreign law and, in the alternative, that the plaintiffs have failed to state a claim under the ATS.  Although the TVPA does not preempt a common law cause of action for torture, the plaintiffs have failed to state

_____

[1] Shortened references such as this will be used for ease of identification since all plaintiffs share the same surname.

an ATS claim upon which relief can be granted because their allegations of non-state torture are not recognized as violations of the law of nations.  Supplemental jurisdiction over the plaintiffs' third party claims will be declined, and the defendants' motion to dismiss therefore will be granted.[2]

<u>BACKGROUND</u>

The amended complaint alleges the following information. Ali lived in the West Bank Palestinian territory from 1948 to 1994, and, during a substantial period of that time, he served as an Israeli agent and confidential informant.  (Am. Compl. ¶ 23.) In 1994, Ali relocated to the city of Haifa in Israel and stopped serving as an Israeli agent.  (<u>Id.</u> ¶¶ 24, 25.)  Widespread violence erupted in September 2000 between armed Palestinians and the Israeli army.  "This wave of violence, which continued until 2005, is commonly referred to as the 'Intifada.'"  (<u>Id.</u> ¶ 11.) "Palestinian agents and confidential informants enabled Israeli authorities to prevent or at least limit armed Intifada violence" and "defendants PA and PLO did all in their power to identify these Palestinian agents and confidential informants and put an end to their cooperation with Israeli authorities, and to deter other Palestinians from becoming agents and informers for

---

[2] The plaintiffs have also filed a motion for jurisdictional discovery on the issue of whether there is a basis for asserting personal jurisdiction against the defendants in this court.  This motion will be denied as moot since the motion to dismiss will be granted.

Israel." (Id. ¶ 18.)  In September 2001, Ali traveled with his
then-girlfriend and his daughter to the West Bank to visit his
mother.  (Id. ¶ 26.)  He alleges that during that visit, members
of the PA's security services entered his mother's home in the
middle of the night, demanding that Ali accompany them to their
headquarters.  (Id. ¶ 28.)  At their headquarters, PA security
officers, many of whom were also officers, employees, or agents
of the PLO, accused Ali of being an Israeli informant.  (Id.
¶¶ 30, 61.)  Ali alleges that over the course of the next six
months, the security officers interrogated him, beat him, whipped
him with heavy metal cables, strapped his legs to a wooden bar
and beat the soles of his feet until they swelled and bled, and
poured hot salt water over his open wounds.  (Id. ¶¶ 31-57.)  His
captors eventually abandoned him in the face of Israeli military
activity in the area, and after his rescue, he returned to Haifa.
(Id. ¶¶ 57-59.)

The plaintiffs bring two claims under the ATS, alleging that
the torture "violated 'the law of nations'" because it occurred
during an armed conflict and because it was carried out by public
officials.  They also bring a third-party claim on behalf of
Lamia for negligence under the Israeli Civil Wrongs Ordinance.
The defendants have moved to dismiss the complaint under Rule
12(b)(6), arguing that the TVPA preempts any common law torture
claims under the ATS, and that even if it does not preempt those

- 4 -

claims, the plaintiffs have not pled a violation of the law of nations.[3]  The plaintiffs argue that they have stated a claim upon which relief can be granted because the TVPA does not provide the exclusive remedy for claims of torture, and that the allegations of torture constitute violations of the law of nations.

## DISCUSSION

A party may move under Federal Rule of Civil Procedure 12(b)(6) to dismiss a complaint for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  "A Rule 12(b)(6) motion tests the legal sufficiency of a complaint[.]"  Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  In a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must be construed in the light most favorable to the plaintiff, id., and "the court must assume the truth of all well-pleaded allegations."  Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, acceptable as true, to 'state a claim to relief that is plausible

---

[3] The defendants also have moved to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, arguing that the claim presents a non-justiciable political question, and under Rule 12(b)(2), arguing that there is no personal jurisdiction over the defendants.  These issues will not be addressed since the complaint will be dismissed for failure to state an ATS claim and jurisdiction over the Israeli law claim will be declined.

- 5 -

on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570

(2007)).  A plaintiff must plead "factual content that allows the

court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  Id.

Ordinarily, a federal court must first determine that it has

jurisdiction over a case before ruling on its merits.  Sinochem

Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422,

430-31 (2007); Steel Co. v. Citizens for a Better Env't, 523 U.S.

83, 94 (1998) ("Without jurisdiction the court cannot proceed at

all in any cause.") (quoting Ex parte McCardle, 74 U.S. 506, 514

(1868)).  However, when a case can be "resolved on the merits in

favor of the same party[,]" it is not necessary to grapple first

with difficult jurisdictional questions.  Norton v. Mathews, 427

U.S. 524, 532 (1976); see also Feinstein v. Resolution Trust

Corp., 942 F.2d 34, 40 (1st Cir. 1991) (noting that where "the

affected defendant does not insist that the jurisdictional issue

be determined first, . . . we cannot fault the district court for

eschewing difficult jurisdictional and venue-related issues in

favor of ordering dismissal on the merits").  The defendants do

not object to the possibility of dismissing the claim on the

merits without considering the jurisdictional questions.[4]

---

[4] In any event, since the plaintiffs have failed to state
common law claims for violations of the law of nations upon which
relief can be granted, they have also failed to establish that

- 6 -

(Defs.' Mem. of Law in Supp. of the PA's and the PLO's Mot. to Dismiss ("Defs.' Mem.") at 44-45.)

I.   CAUSES OF ACTION UNDER THE ATS

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  This statute confers a jurisdictional grant for a "narrow set of common law actions derived from the law of nations[.]"  Sosa v. Alvarez-Machain, 542 U.S. 692, 721 (2004).  While the ATS may provide subject-matter jurisdiction for modern causes of action not recognized at the time of its initial passage in 1789, id. at 724-25 (noting that no development in the law since the passage of the ATS "has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law"), there is a "high bar to new private causes of action for violating international law[.]"  Id. at 727.  "[A] decision to create a

_____

there is subject-matter jurisdiction over those claims because the ATS jurisdictional grant extends only to "actions alleging violations of the law of nations."  Sosa v. Alvarez-Machain, 542 U.S. 692, 720 (2004).  Since courts may raise the issue of subject matter jurisdiction sua sponte, NetworkIP, LLC v. FCC, 548 F.3d 116, 120 (D.C. Cir. 2008), there is no procedural infirmity in considering whether the plaintiffs have stated a claim under the ATS before determining whether the plaintiffs' claims are non-justiciable under the political question doctrine (see Defs.' Mem. of Law in Supp. of the PA's and the PLO's Mot. to Dismiss at 31) or whether there is personal jurisdiction over the defendants.  (See id. at 37.)

- 7 -

private right of action is one better left to legislative judgment in the great majority of cases[,]" especially because of "the potential implications for the foreign relations of the United States of recognizing such causes[.]"  Id.

    A.   The effect of the TVPA on torture claims under the ATS

Torture is one of the rare situations in which courts have recognized a common law cause of action under the ATS.  See, e.g., Filartiga v. Pena-Irala, 630 F.2d 876, 880 (2d Cir. 1980) (holding that "an act of torture committed by a state official against one held in detention" is actionable under the ATS because it "violates established norms of the international law of human rights").  After a federal circuit judge expressed doubt that such a judicially-created cause of action was appropriate, see Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 813 (D.C. Cir. 1984) (Bork, J., concurring) (questioning the propriety of finding that "a rule has evolved against torture by government so that our courts must sit in judgment of the conduct of foreign officials in their own countries with respect to their own citizens"), Congress passed the TVPA.  See S. Rep. 102-249, at 4-5 (1991) ("Judge Robert H. Bork questioned the existence of a private right of action under the [ATS], reasoning that separation of powers principles required an explicit grant by Congress of a private right of action for lawsuits which affect foreign relations.  The TVPA would provide such a grant[.]"

- 8 -

(citing <u>Tel-Oren</u>)).  The TVPA provides, in relevant part, that
"[a]n individual who, under actual or apparent authority, or
color of law, of any foreign nation . . . subjects an individual
to torture shall, in a civil action, be liable for damages to
that individual[.]"  28 U.S.C. § 1350.  The Supreme Court cited
the TVPA as an example of a clear Congressional mandate for
creating a cause of action for claims of torture and
extrajudicial killing, but the Court did not explicitly recognize
the TVPA as providing the exclusive remedy for torture claims.
See <u>Sosa</u>, 542 U.S. at 728 (observing that the "affirmative
authority" of the TVPA "is confined to specific subject matter"
and that "the legislative history includes the remark that [the
ATS] should 'remain intact to permit suits based on other norms
that already exist or may ripen in the future into rules of
customary international law'" (quoting H.R. Rep. No. 102-367(I),
at 4 (1991))).

Two circuit courts have since reached opposite conclusions
about whether the TVPA occupies the field with respect to claims
for torture and preempts any common law torture claim that a
plaintiff might otherwise plead under the ATS.  In <u>Aldana v. Del
Monte Fresh Produce, N.A., Inc.</u>, 416 F.3d 1242 (11th Cir. 2005),
the Eleventh Circuit found that a plaintiff could raise separate
claims for torture under the TVPA and the ATS.  The court found
support for its conclusion in the differing statutory texts of

- 9 -

the TVPA and ATS,[5] the lack of an explicit holding in <u>Sosa</u> that
the TVPA provided the sole remedy for torture claims, and the
canon disfavoring interpreting a later statute as amending by
implication an earlier one where no intent to repeal or amend is
clear and manifest, reasoning that viewing the TVPA as providing
the exclusive remedy for torture would require viewing the TVPA
as having amended the ATS by implication.  <u>Id.</u> at 1250-51.  On
the other hand, in <u>Enahoro v. Abubakar</u>, 408 F.3d 877, 884-85 (7th
Cir. 2005), the Seventh Circuit found the TVPA did occupy the
field of possible causes of action for torture because "[i]f it
did not, it would be meaningless" since "[n]o one would plead a
cause of action under the [TVPA] and subject himself to its
requirements if he could simply plead under international law."
The court dismissed the notion that the TVPA's legislative
history reflected Congressional intent to preserve a torture
cause of action under the ATS, arguing that the language that
"[the ATS] should remain intact to permit suits based on other
norms[,]" merely signaled Congress' intent to preserve the
possibility of judicially created causes of action for violations
of international law other than for torture and killing, which

---

[5] "Torture is actionable under the [ATS], but only if the
conduct is committed in violation of the law of nations.  By
contrast, Congress provided an express definition of torture in
the [TVPA]."  <u>Aldana</u>, 416 F.3d at 1250 (internal quotation marks,
citation, and footnote omitted).

the TVPA covers.  Id. at 885 n.2 (quoting H.R. Rep. No. 102-367(I)).

The defendants argue that

because Congress enacted the TVPA to allow suits for
torture under the ATS subject to the express limitation
that such suits might only be brought against
'individual[s]' acting at the behest of a 'foreign
nation,' it follows that the TVPA precludes ATS suits
for torture brought against defendants who are *not*
individuals acting at behest of a foreign nation.

(Defs.' Reply in Further Supp. of the PA's and the PLO's Mot. to
Dismiss at 6 (quoting 28 U.S.C. § 1350) (alteration in
original).)  "A frequently stated principle of statutory
construction is that when legislation expressly provides a
particular remedy or remedies, courts should not expand the
coverage of the statute to subsume other remedies."  Nat'l R.R.
Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453,
458 (1974).  However, when Congress enacted the TVPA, it was not
legislating on a blank canvas, as courts previously had
recognized a torture cause of action under the ATS.  See, e.g.,
Filartiga, 630 F.2d at 880.  It is therefore notable that
Congress did not state explicitly that the TVPA provided the sole
remedy for plaintiffs alleging claims of torture.  See 28 U.S.C.
§ 1350.  Recognizing a torture cause of action under the ATS
would not expand the scope of available remedies, but rather
would merely continue to recognize a remedy already in existence
at the time of the TVPA's enactment.

- 11 -

Moreover, like all canons of construction, the principle that courts should refrain from interpreting statutes so as to create new remedies for statutory violations is not absolute.  It must yield in the face of evidence of contrary legislative intent, including legislative history.  <u>Nat'l R.R. Passenger Corp.</u>, 414 U.S. at 458.  The TVPA's legislative history provides that the TVPA would

> enhance the remedy <u>already available</u> under [the ATS] in an important respect: While the [ATS] provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad.  Official torture and summary executions merit special attention in a statute expressly addressed to those practices.  At the same time, claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered b[y] [the ATS].  That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.

H.R. Rep. 102-367(I), at 4 (emphasis added).  The "already available" language reflects Congressional awareness that the ATS provided a torture remedy prior to the enactment of the TVPA.  Thus, the absence of any language in the statute or the legislative history stating that the TVPA provided the exclusive cause of action for torture strongly suggests that Congress intended not for the TVPA to displace the ATS torture remedy, but for the TVPA cause of action to complement the ATS remedy.  Additionally, Congress affirmatively stated its intent to leave the ATS intact to provide causes of action for violations of

- 12 -

"other norms."  While the defendants argue that the statement that "claims based on torture or summary executions do not exhaust the list of actions" forecloses the possibility that any subsequent claim of torture could constitute one of these other norms, the sentence preceding that text in the legislative history singles out official torture for consideration, not all torture.  Construing the TVPA to provide the exclusive cause of action only for torture carried out by individuals is therefore entirely consistent with its legislative history.

The conclusion that the TVPA does not provide the exclusive remedy for torture claims is also entirely consistent with the Supreme Court's treatment of the TVPA in Sosa.  The Court did not view the TVPA as supplanting the common law torture cause of action.  Instead, it perceived Congress as having responded to the judicial recognition of a torture cause of action in Filartiga and Tel-Oren, "by enacting legislation supplementing the judicial determination[.]"  Sosa, 542 U.S. at 731 (emphasis added).

Defendants correctly assert that Ali may not plead a cause of action against non-natural persons under the TVPA.  See Fisher v. Great Socialist People's Libyan Arab Jamahiriya, 541 F. Supp. 2d 46, 50 n.2 (D.D.C. 2008) (stating that "the TVPA only creates a cause of action against individuals, not states"); Doe v. Exxon Mobil Corp., 393 F. Supp. 2d 20, 28 (D.D.C. 2005) ("On balance,

the plain reading of the [TVPA] strongly suggests that it only
covers human beings, and not corporations."). However, this does
not necessarily preclude Ali's factual allegations from
supporting a claim. Because the TVPA does not preempt claims for
torture committed by non-individuals, Ali is free to plead a
cause of action under the ATS for torture committed by non-
natural persons. Accord Kadic v. Karadzic, 70 F.3d 232, 241 (2d
Cir. 1995) ("[The defendant] also contends that Congress intended
the state-action requirement of the [TVPA] to apply in actions
under the [ATS]. We disagree. . . . The scope of the [ATS]
remains undiminished by enactment of the [TVPA]."); Bowoto v.
Chevron Corp., 557 F. Supp. 2d 1080, 1085 (N.D. Cal. 2008)
("Enahoro notes that the TVPA does not supplant all causes of
action previously acceptable under the ATS, but instead occupies
the field for pleadings of torture and killing as provided for in
the TVPA." (emphasis added) (internal quotation marks omitted)).
Although Enahoro expressed concern that "[n]o one would plead a
cause of action under the [TVPA] and subject himself to its
requirements if he could simply plead under international law[,]"
408 F.3d at 885, construing the TVPA not to preempt ATS torture
claims against non-natural persons would not render the TVPA's
cause of action against natural persons meaningless. The TVPA
appears to preempt the field with respect to claims of torture
against individuals, and plaintiffs alleging a cause of action in

- 14 -

that situation are subject to the pleading constraints of the
TVPA.

     B.   <u>Torture as a violation of the law of nations</u>

     To state a claim under the ATS, a party must plead a
violation of "the law of nations[.]"  28 U.S.C. § 1350.  "The law
of nations, currently known as international customary law, is
formed by the 'general assent of civilized nations.'"  <u>Doe v.
Islamic Salvation Front (FIS)</u>, 993 F. Supp. 3, 7 (D.D.C. 1998)
(quoting <u>Filartiga</u>, 630 F.2d at 880).  An international norm must
be sufficiently definite and accepted "among civilized nations"
to qualify for the ATS jurisdictional grant.  <u>Sosa</u>, 542 U.S. at
732.  While a newly recognized claim must be "gauged against the
current state of international law," <u>id.</u> at 733, <u>Sosa</u> does not
invite courts to ignore binding precedent when making a
determination about the existence of an international norm.  A
court may look to "the customs and usages of civilized nations;
and, as evidence of these, to the works of jurists and
commentators, who by years of labor, research, and experience,
have made themselves peculiarly well acquainted with the subjects
of which they treat[,]" but only when there is "no controlling
. . . judicial decision" on that particular subject.  <u>Id.</u> at 734
(quoting <u>Paquete Habana</u>, 175 U.S. 677, 700 (1900)).

- 15 -

The parties agree that the PA and the PLO are non-state actors.[6]  (Defs.' Mem. at 17; Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss the First Am. Compl. ("Pls.' Mem.") at 18.)  The D.C. Circuit has explicitly refused to acknowledge the existence of an international norm against torture by non-state actors in the absence of a pronouncement by the Supreme Court.  Tel-Oren, 726 F.2d at 795 (Edwards, J., concurring) ("While I have little doubt that the trend in international law is toward a more expansive allocation of rights and obligations to entities other than states, I decline to read [the ATS] to cover torture by non-state actors, absent guidance from the Supreme Court[.]"); Sanchez-Espinoza v. Reagan, 770 F.2d 202, 206-07 (D.C. Cir. 1985) (concluding that customary international law "does not reach private, non-state [torture] for the reasons stated by Judge Edwards in Tel-Oren"); see also Ibrahim v. Titan Corp., 391 F. Supp. 2d 10, 14 (D.D.C. 2005) (noting that while "treaties and

_____

[6] See Biton v. Palestinian Interim Self-Government Auth., 310 F. Supp. 2d 172, 181 (D.D.C. 2004) (noting that the "long-running conflict between the Israelis and Palestinians has its very origins in the question of statehood between them" and refusing "to declare that Palestine is now a sovereign state among nations"); see also Tel-Oren, 726 F.2d at 803-04 (Bork, J., concurring) (reasoning that the act of state doctrine does not apply to the PLO because it does not "seem to be a state under international law"); Knox v. Palestine Liberation Org., 306 F. Supp. 2d 424, 429-30 (S.D.N.Y. 2004) (refusing to dismiss claims against the PA and PLO on sovereign immunity grounds because they did not establish that Palestine is a state under § 201 of the Restatement (Third) of Foreign Relations Law of the United States (1987)).

- 16 -

other sources of international law that strongly condemn torture"
"address official (state) torture, . . . the question is whether
the law of nations applies to *private actors*[,]" and "[t]he
Supreme Court has not answered that question, but in the D.C.
Circuit the answer is no" (internal citation omitted)).

Plaintiffs argue that these precedents are not controlling
because they are twenty-five years old and do not reflect the
current law of nations.  (Pls.' Mem. at 16-17.)  Thus, they urge
that even though Sanchez-Espinoza and Tel-Oren rejected the
notion that torture by non-state actors violated the law of
nations, their second claim for relief, in which they allege
torture under the direction of the PA "by a public official or
other persons acting in an official capacity" (Am. Compl. ¶ 85),
states a violation of the law of nations "irrespective of whether
the public official is acting under the color of a foreign
nation[.]"  (Pl.'s Mem. at 24.)  To support this proposition, the
plaintiffs cite Karadzic.

Karadzic rejected the notion that "the law of nations, as
understood in the modern era, confines its reach to state
action."  70 F.3d at 239.  Instead, "certain forms of conduct
violate the law of nations whether undertaken by those acting
under the auspices of a state or only as private individuals."
Id.  In reaching this conclusion, the Second Circuit cited, among
other sources, the Restatement (Third) of the Foreign Relations

- 17 -

Law of the United States (1986) for the proposition that states
can establish civil remedies for international law violations of
"universal concern[,]" even if those violations were committed by
individuals and not states.  <u>Karadzic</u>, 70 F.3d at 240 (quoting
Restatement (Third) of the Foreign Relations Law of the United
States § 404).  Including torture as a violation of law of
universal concern, <u>Karadzic</u> concluded that "the proscription of
official torture[] applies to states without distinction between
recognized and unrecognized states."  <u>Id.</u> at 240, 245.

 <u>Islamic Salvation Front</u> refused to apply <u>Tel-Oren</u> and
instead cited <u>Karadzic</u> in holding that Common Article 3 of the
Geneva Conventions reflected an international norm against
torture committed by any party to a conflict, not solely official
governments.  993 F. Supp. at 8.  In addition to finding that the
"interpretation of international law in *Karadzic* in 1995 is far
more timely than the interpretations set forth in *Tel-Oren*," the
court also hesitated to embrace <u>Tel-Oren</u> because "the panel
issued a fragmented decision, with each judge affirming for
different reasons."  <u>Id.</u>  This analysis, however, did not address
<u>Sanchez-Espinoza</u>, a non-fragmented decision in which the D.C.
Circuit unequivocally adopted Judge Edwards' concurrence in <u>Tel-
Oren</u> rejecting the notion that non-state torture violated an
international norm.  These precedents are binding here, whether
or not they reflect an antiquated construction of international

- 18 -

norms.  <u>Sanchez-Espinoza</u> and <u>Tel-Oren</u> may be ripe for
reconsideration by the circuit, especially in light of the well-
reasoned and more recent opinion in <u>Karadzic</u>, but under the
current state of the law in this circuit, the plaintiffs cannot
state an ATS claim for torture against either of the non-state
defendants.

Plaintiffs also argue that their first claim for relief is
distinguishable from the claims previously considered by the D.C.
Circuit because the acts of torture they allege occurred in the
course of the Intifada, which is an "armed conflict" under
international law.  (Pls.' Mem. at 21 (emphasis omitted).)
However, <u>Sanchez-Espinoza</u> considered allegations of torture in
the course of the armed conflict between the Contras -- "anti-
Nicaraguan terrorist groups" -- and the government of Nicaragua.
770 F.2d at 205.  "The complaint recounts the specific instances
of attacks on Nicaraguan towns and villages that caused harm to
the Nicaraguan appellants," instances including torture.  <u>Id.</u> at
205-06.  The plaintiffs therefore cannot successfully distinguish
<u>Sanchez-Espinoza</u> on the ground that their allegations of torture
occurred in the course of an armed conflict.

## II.  THIRD-PARTY CLAIMS

"[I]n any civil action of which the district courts have
original jurisdiction, the district courts shall have
supplemental jurisdiction over all other claims that . . . form

part of the same case or controversy[.]" 28 U.S.C. § 1367(a).
However, "[p]endent jurisdiction is a doctrine of discretion, not
a plaintiff's right." Shekoyan v. Sibley Int'l, 409 F.3d 414,
423 (D.C. Cir. 2005) (quoting United Mine Workers v. Gibbs, 383
U.S. 715, 726 (1966)). A district court, in its discretion, may
choose not to exercise supplemental jurisdiction over a claim if
"the district court has dismissed all claims over which it has
original jurisdiction[.]" 28 U.S.C. § 1367(c); Mead v. City
First Bank of DC, N.A., 616 F. Supp. 2d 78, 81 (D.D.C. 2009). A
court is to balance considerations of judicial economy,
convenience, fairness, and comity, but in a typical case where
all federal law claims have been dismissed, the factors will
counsel against exercising supplemental jurisdiction. Skekoyan,
409 F.3d at 424.

The plaintiffs' third claim alleges a violation of Israeli
law, and the plaintiffs have not pled a jurisdictional basis for
that claim other than supplemental jurisdiction under § 1367.
(Am. Compl. ¶¶ 9, 94.) Because the plaintiffs' first two claims
will be dismissed, there are no remaining claims over which there
exists original subject-matter jurisdiction. Notions of comity
and efficiency weigh heavily in favor of allowing an Israeli
court to make determinations about Israeli law, and there are no
overriding concerns regarding fairness or convenience that
counsel against declining to exercise supplemental jurisdiction

over the plaintiffs' third claim for relief.  Thus, that claim

will be dismissed.[7]

CONCLUSION

Although the TVPA does not preempt claims for torture under

the ATS, the plaintiffs cannot state a claim for relief under the

ATS because in this circuit, non-state sanctioned torture does

not violate the law of nations.  Since the plaintiffs' ATS claims

will be dismissed, supplemental jurisdiction over their third-

---

[7] Plaintiffs also have pled that

> [a]s the result of the torture and physical and mental
> abuse of Ali Mahmud Ali Shafi by the PA and the PLO,
> plaintiffs Shirin Ali Shafi and Lamia Ali Shafi
> suffered and continue to suffer severe and permanent
> psychological, mental and emotional pain, suffering,
> disability and distress, were and are deprived of the
> society, consortium, comfort, care and solatium of Ali
> Mahmud Ali Shafi, and suffered serious pecuniary harm.

(Am. Compl. ¶78; see also id. ¶ 89.)  To the extent that
plaintiffs advance these statements of damages as independent
causes of action under the ATS for Shirin and Lamia (see Pls.'
Mem. at 26), they have failed to state a claim under that statute
for the same reasons that Ali has failed to state a claim.

However, the plaintiffs also argue that the proper basis for
these third-party claims is the tort of intentional infliction of
emotional distress under District of Columbia law.  (Id. at 27.)
To the extent that plaintiffs' complaint could be construed to
state such a claim, the plaintiffs have not pled a jurisdictional
basis for it other than supplemental jurisdiction under § 1367.
Although considerations of comity and judicial economy may not
weigh as heavily in favor of dismissal of a claim under District
of Columbia law as they do for a claim under Israeli law, there
are also no unusual circumstances counseling in favor of
exercising supplemental jurisdiction either.  Thus, any claim for
intentional infliction of emotional distress also will be
dismissed.

- 21 -

party claims under Israeli or D.C. law will be declined.  Thus,

the defendants' motion to dismiss will be granted.  A final Order

accompanies this memorandum opinion.

SIGNED this 23rd day of February, 2010.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge